# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA DIVISION

| | | |
|---|---|---|
| LUCIA KU GONZALEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:24-cv-00333-CLC-MJD |
| | ) | |
| v. | ) | JURY DEMAND |
| | ) | |
| COCA-COLA BOTTLING COMPANY UNITED, INC., | ) | Judge Collier |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Comes the Plaintiff, Lucia Ku Gonzlez, by and through undersigned counsel, and files this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

## LAW AND ARGUMENT

## SUMMARY OF RELEVANT UNDISPUTED FACTS

Mrs. Gonzalez is a female of Hispanic race and origin. (Gonzalez Dep. 11:1-6). She was employed by Defendant from December 29, 2020 until her wrongful termination on October 11, 2023. (Gonzalez Dep. 21:17-18; 22:1-23). She was hired as a Machine Operator 1 (MO1), but received training for approximately 6 weeks before she could be certified as a MO1. (Gonzalez Dep. 46:6-8; 49:24-25; 50-51). Mrs. Gonzalez made it known to management that career advancement within the company was very important to her and she wanted to be trained as an Machine Operator 2 (MO2). (Gonzalez Dep. 52:10-25; 53:1-13). However, she received no additional training for approximately one year. (Gonzalez Dep. 52-53). She had no significant work issues until she began complaining in January, 2022 that she was not being

promoted to a Machine Operator 2 (MO2) position when other male co-workers, who were employed the same or less time, were being promoted to the position. (Gonzalez Dep. 52:15-23). The Shift Manager, Nick Gilley, testified that "Training is available at all times." (Gilley Dep. 39:4-19). However, Mrs. Gonzalez' supervisor initially claimed she did not receive training because they were short staffed. (Gonzalez Dep. 52:21-25; 129:1-3). After many months of no training, Mrs. Gonzalez continued to question her supervisor why other employees were being trained but she was not. (Gonzalez Dep. 52:15-25). Her supervisor then claimed that it was because she was the best filler and they wanted to leave her there. (Gonzalez Dep. 53:1-13). However, when Mrs. Gonzalez continued to inquire about the MO2 position, her supervisor said she needed to learn more machines. (Gonzalez Dep. 53-56; Gilley Dep. 36-38). When she requested the training, she would be placed on the schedule but would not receive the training. (Gonzalez Dep. 54:16-25; 55:13). Alot of times she would be sent back to the filler. (Gonzalez Dep. 55:4-13; 109:11-13; Fitch Dep. 18:15-25; 19:1-23).

Neil Fitch, who was Mrs. Gonzalez' supervisor from April 4, 2022 until she became a MO2 on March 13, 2023, testified that he was not aware of any training provided to Mrs. Gonzalez to become a MO2. (Fitch Dep. 12:8-21; 52:12-25; 53:1-17). Fitch testified that employees must learn to operate 7 to 9 machines to become a MO2. (Fitch Dep. 9:2-16; 12:8-18; 13:9-11). However, Nick Gilley, the Shift manager over Fitch, testified that there are 9 MO2 machines and an employee must learn to operate at least 4 to become an MO2. (Gilley Dep. 8:6-10; 15:4-17). They only hire employees for a MO1 position and then train them for a MO2 position. (Fitch Dep. 22:21-25; 23:1). It takes approximately 6-8 weeks to be trained as an MO1 operator. (Gilley Dep. 13:6-25). The training for a MO2 operator is more hands on because it involves changing over the machine. (Gilley Dep. 14:1-13).

Fitch testified that in 2025 he hired more than 5, but less than 10, employees for a MO1 position and the same or more in 2024. (Fitch Dep. 22:7-25; 23:1-1). They always have open MO1 positions. (Fitch Dep. 37:1-18). The company strongly encourages the supervisors to train employees for MO2 positions. (Fitch Dep. 45:10-25; 30:21-25; 31:1-22). ). Fitch testified that "It's just a natural progression within the company" and provides the employee with better pay and more advancement opportunities. (Fitch Dep. 45:24-25; 46:1-25). There is no limit on the number of MO2 operators. (Gilley Dep. 20:4-9).

In July, 2022, Mrs. Gonzalez filed a charge of race and gender discrimination with the EEOC. (Gonzalez Dep. 115:21-25; 116; Exh 24). Mrs. Gonzalez complained to the plant manager about the discrimination the first week of January, 2023. (Griffith Dep. 8-9; 24-25). The plant manager, Tim Griffith, testified that Mrs. Gonzalez complained to him about not being trained for the MO2 position. (Griffith Dep. 5:17; 8:22-25; 9:1-25). Griffith investigated but was not able to determine the reason for the delay and he just tried to get her training going. (Griffith Dep. 9; 13:7-23). He was not made aware of any issues with her work performance that would affect her training. (Griffith Dep. 24:10-16). He would have nothing negative to say about her work performance. (Griffith Dep. 28:11-18). He met with Collins and Mrs. Gonzalez on more than one occasion to get her training going. (Griffith Dep. 24:17-25; 25:1-4). They encourage employees to learn the MO2 position because it provides the company with "more flexibility for scheduling, etc." (Griffith Dep. 11:8-12). The training is scheduled by the supervisors and the shift manager. (Griffith Dep. 12:2-6). There are approximately 15 or more MO2 operators on all shifts. (Gilley Dep. 15:25; 16:1-10). They do not have a limit on the number of MO2 operators. (Gilley Dep. 17:12-17; 18:10-20).

3

Following her continued complaints about the lack of training, Mrs. Gonzalez noticed that her supervisors' attitude towards her became increasingly hostile. (Gonzalez Dep. 70-71; 152-153; Exh. 23). On one occasion, Mrs. Gonzalez called on the radio to get someone to relieve her so she could use the restroom. (Gonzalez Dep. 111:13-25; 112:1-24; 114; 147:3-8). Her supervisors ignored her calls and as a result Mrs. Gonzalez urinated on herself. (Gonzalez Dep. 112). She reported this to her previous manager who said he would talk to her direct supervisors about the incident and instructed her to stop the machine and go to the restroom if it happened again. (Gonzalez Dep. 112:25; 113-114). This continued to happen so Mrs. Gonzalez stopped her machine and went to the restroom if her supervisors did not respond to her calls for help. (Gonzalez Dep. 114). Mrs. Gonzalez was also singled out and yelled at if she was talking to another employee or on her cell phone. However, she observed her supervisor looking the other way when other employees were talking or on their cell phones. (Gonzalez Dep. 145-146; Exh. 23). Mrs. Gonzalez also complained that Gilley denied her request for vacation days claiming they were already taken when another supervisor told her the dates were available. (Gonzalez Dep. 146:7-12; Gilley Dep. 95-96; Exh. 23). If she was called to the office or spoken to about something, all of the supervisors would gather around her like she was a criminal. (Gonzalez Dep. 147:10-15; 70-71). Mrs. Gonzalez was also denied incentive pay when she reported problems on the line with her supervisor stating that was her job. (Gonzalez Dep. 147:17-25: 148:1-2). Mrs. Gonzalez testified that "they bother me all time, all time for no reason" and "they stay over me all the time." (Gonzalez Dep. 142:19; 144:3-4; Exh. 23).

Mrs. Gonzalez began experiencing anxiety and depression as she watched male employees being trained and promoted over her. (Gonzalez Dep. 12:21-25; 13:1-11; 14:12-25; 15:1-25; 16:1-13). She became so physically ill and overcome with insomnia, anxiety and

4

depression that she had to seek medical attention and was referred to a psychologist for treatment and medication. (Gonzalez Dep. 14:12-25; 15:1-25; 16:1-13). As a result, she had to take intermittent FMLA beginning in February, 2023. (Gonzalez Dep. 120:8-16; Exh. 15; Collins Dep. 21:17-21). Mrs. Gonzalez had previously taken FMLA leave in 2022 to care for her granddaughter who had serious medical issues. (Gonzalez Dep. Exh. 15, 18, 23).

There were only two employees who were certified as MO2 operators on second shift as of January 1, 2023. (Gilley Dep. 46:2-16). They do not have any female employees who are MO2s on second shift. (Fitch Dep. 25:16-20). Gilley recalled two male employees who were promoted to MO2 during Ms. Gonzalez' employment. (Gilley Dep. 31-32). Mrs. Gonzalez submitted a written complaint on January 11, 2023 that she was not being put on the schedule to train, which stated:

> I went to the plant with the boss to ask him about my training and he told me that he was going to investigate what was happening and that he would let me know later. After that, they were going to start training me in the labels the following week and that's how it was on Monday, January 9 and 10. I had a schedule for training on Monday, yes, I trained, but on Tuesday they sent me to the filler because they needed people and I just I told them ok it's fine. Later I spoke to (N) again that same day 10/1/2023 and I told him to please put me on the schedule to learn in the labels since one of the days of my training they sent me to the filler, and he told me let me see the What can I do next week? Today I checked the schedule for next week and he did not give me any day to train. But after he spoke like (T) on the 4th or 5th I don't remember well, he called me at the office to talk about my training together with the person from (HR) he told me (T) that he would have a meeting with the supervisors so that I My training will continue but apparently they have not had the meeting yet because they still do not train me except for 1/9/2023. (Gilley Dep. 89:12-25: 90:1-12).

Gilley was not notified of her complaint. (Gilley Dep. 71:19-25; 72:3-21, Exh. 7; Gonzalez Dep. Exh. 23). On January 18, 2023, Mrs. Gonzalez became aware that a male employee had been promoted to MO2 over her and complained to Fitch. (Gilley Dep. 90:14-25; 107:9-25; 108:1; Fitch Dep. 15:3-10). She complained that she had been asking for the MO2 position for a year and that Fitch was being a racist and discriminating against her because she was female. (Fitch

Dep. 24:21-25; 25:1-11; 38:20-25; 39:1-16, Exh. 2; Gilley Dep. 107:9-25; 108:1). She submitted a written complaint, stating:

> On 1/18/23 I was talking with a co-worker and he commented that in the afternoon shift there are only 4 m02 and he mentioned the names of the people and one of them has only been working here for a year so when I heard So I went to the office and I asked Neil if he could explain to me how it is that people who have been working for a year are already M02 and that I have been working here for 2 years and one year asking to continue my training to be M02 and they don't train me the I just answer I can't talk to you about other workers and I told him I don't want you to tell me about others I just want you to explain to me why they don't want to do M02 to me because they keep discriminating against me for being a woman or Hispanic I don't understand they are racist with me but now I won't say anything else I see how they are but thanks for that and he told me-the reason is because he knew how to changeover and I told him ok neil once again thanks for continuing to be racist with me and discriminating I turned around and left the office. (Gonzalez Dep. Exh. 23).

Fitch acknowledged that he was aware of the training provided to the male employee who was promoted to MO2 before Mrs. Gonzalez. (Fitch Dep. 49:8-25). He is not aware of any investigation of Mrs. Gonzalez' complaint against him. (Fitch Dep. 33:10-20). Fitch sent an email to his supervisor, Nick Gilley, on January 18, 2023 making him aware of Mrs. Gonzalez' complaint. (Gilley Dep. 107-108). Gilley forwarded the email from Fitch to HR. (Gilley Dep. 107-108). Gilley then began meeting with Mrs. Gonzalez weekly to review her training to get things moving so she could get her MO2 and this continued until she was certified as an MO2 operator on March 13, 2023. (Gilley Dep. 73-74; 89-90; 110). Gilley is not aware of any prior training plan for Mrs. Gonzalez. (Gilley Dep. 96). He never investigated why the training was not provided to Mrs. Gonzalez. (Gilley Dep. 111). Gilley had to approve Mrs. Gonzalez promotion to MO2. (Gilley Dep. 32:23-25). Fitch testified that Mrs. Gonzalez performed her job well and he would not have anything negative to say about her employment, (Fitch Dept. 36:11-25).

Mrs. Gonzalez was finally promoted to the Machine Operator 2 position on March 13, 2023. (Gonzalez Dep. 47:21-25; 48:1-13). However, after repeatedly requesting training for the

6

MO2 position and then taking FMLA leave, Mrs. Gonzalez noticed that the attitude of her supervisors towards her changed and became more hostile. (Gonzalez Dep. 70-71; 152-153). Management also continued to harass her. (Gonzalez Dep. 30:18-25: 31:1-4; 56:1-5; 69:24-25; 70-72). As a result, Mrs. Gonzalez had to go back on medical leave on April 6, 2023. (Gonzalez Dep. Exh. 15). When she was released to return to work in May, 2023, she sent to take a drug test on May 22, 2023, but was reprimanded for being late due to the drug test. (Collins Dep. 142-143). Mrs. Gonzalez became so distraught over the continued harassment that on May 26, 2023, she had to go back on medical leave. (Gonzales Dep. Exh. 15).

On June 27, 2023, Mrs. Gonzalez's physician prepared a note releasing her to return to work on September 25, 2023. (Gonzalez Dep. Exh. 18). On July 5, 2023, Mrs. Gonzalez sent a text to Shelly Collins, Employee Relations Manager, with a copy of the doctor's release stating that she would be released to return to work on September 25, 2023 but Collins did not respond. (Gonzalez Dep. 86, Exh. 18). On July 17, 2023, Collins sent a letter to Mrs. Gonzalez stating that "On 5/26/23 you began Family Medical Leave for your own serious health condition. Under the Family Medical Leave Act, you are allowed up to 12 weeks of leave for qualified serious health conditions. As of 7/15/2023 you will have used your full 12 weeks." (Gonzalez Dep. Exh. 17). Collins further stated, "Please let me know if you intend to return to work when your FMLA leave expires." (Gonzalez Dep. Exh. 17). Collins also stated, "If you are unable to work, you can remain on medical leave for another 3 months if you qualify for short term disability insurance." (Gonzalez Dep. Exh. 17). Collins stated that if she did not hear from Mrs. Gonzalez, she would be terminated on July 29, 2023. (Gonzalez Dep. Exh. 17).

Mrs. Gonzalez applied for short term disability and was approved on July 28, 2023 for benefits through August 28, 2023. (Gonzalez Dep. Exh. 18). On September 12, 2023, Mrs.

Gonzalez received a letter extending her short-term disability to September 25, 2023. (Gonzalez Dep. Exh. 18). Mrs. Gonzalez sent a text to Mrs. Collins with a screenshot of the letter approving her short-term disability. (Gonzalez Dep. Exh. 18). On September 12, 2023, Mrs. Collins sent a letter to Mrs. Gonzalez, stating:

> Our records indicate you have been on medical leave for more than 6 months, excluding any unsuccessful attempts to return to work that may have occurred during this 6 month period. Do you intend to return to work? If so, when? If you believe you need an accommodation to return to work, please tell us about that.
> If you are not able to return to work on a definite date in the near future, your employment with the Company will be terminated on 10/9/2023. In this event, you will receive information in the mail from the Benefits department regarding your eligibility, if any, for continued participation in the Company benefits plans. If this happens, you are welcome to apply in the future for any position open at the time. If you have any questions or need further information, please contact me. (Gonzalez Dep. Exh. 17).

Again, Collins did not acknowledge the return to work release that Mrs. Gonzalez had previously provided to her. (Gonzalez Dep. Exh. 17, 18). In addition, Collins did not schedule Mrs. Gonzales for her return to work drug test. (Collins Dep. 36; 39-40). Collins testified that if an employee has been out for 30 days, they are required to take a drug test before returning to work (Collins Dep. 38:25; 39-40). Collins testified that Mrs. Gonzales should have been sent a request to take a drug test the week before her return date of 9-25-23. (Collins Dep. 39). Collins testified that it must have been an oversight. (Collins Dep. 40). Mrs. Gonzalez contacted Collins via telephone on September 18, 2023 and reminded her that she had previously provided the note from her doctor releasing her to return to work on September 25, 2023. (Gonzalez Dep. Exh. 19). Mrs. Collins told Mrs. Gonzalez that her position was no longer available and that she would have to apply for available positions on the website. (Gilley Dep. 113:9-25, Exh 14; 114-115; Gonzalez Dep. Exh. 19). Collins does not recall when she posted Mrs. Gonzales position. (Collins Dep. 37). Mrs. Gonzalez stated that she wanted to be returned to her same or similar position. (Gonzalez Dep. Exh. 19). Collins informed Mrs. Gonzalez that she would need to be in

8

another position by October 9th or she would be terminated. (Gilley Dep. 115). Mrs. Gonzalez stated that she did not fully understand what Collins was telling her. (Gilley Dep. 115:19-21). Mrs. Gonzales applied for a forklift position on September 19, 2023. (Collins Dep. 108-109; Exh. 17). Mrs. Gonzalez called Collins again on September 19, 2023 about returning to work and stated that she had applied for a forklift position. (Gonzalez Dep. Exh. 19). Collins said she would investigate and get with the recruiter. (Gilley Dep. 116:17-22; Gonzalez Dep. Exh. 19). Collins testified that she does not know if Mrs. Gonzalez was considered for the forklift position. (Collins Dep. 109:18-20). Previous experience for Forklift operator is not required and anyone can be trained to be a forklift driver. (Gilley Dep. 65:2-25).

Mrs. Gonzalez also applied for a material handler position on September 20, 2023. (McLean Dep. 50:17-23; 52:10-22: Collins Dep. 110). Mrs. Gonzalez was scheduled for an interview on September 25th at 3:30 p.m. and received reminders through the AI system for the interview. (McLean Dep. Exh 4). Then on September 25th at 3:31 p.m., Mrs. Gonzalez received a text from Olivia, the recruiter who is an AI bot, stating, "Hi Lucia. Due to unforeseen circumstances, your upcoming interview for the material handler CHA position is canceled, and we are therefore no longer able to move you forward in the recruiting process. Please reach out to your recruiter for additional details." (McLean Dep. 53-54, Exh 3; Gonzales Dep. Exh. 22). Mrs. Gonzalez attempted to contact the recruiter to determine the reason for cancellation but did not receive a response. (Gonzalez Dep. 102-103; Exh. 20, 22). Collins testified that she does not know if Mrs. Gonzalez was considered for the position. (Collins Dep. 110:12-18). Ms. Collins testified that she does not know if anyone contacted Mrs. Gonzalez about the forklift or material handlers positions. (Collins Dep. 110:22-25; 111:1). Ms. Gonzalez had also applied for an

Operator filler position on September 26, 2023 but did not receive a response. (Gonzalez Dep. Exh. 20; Collins Dep. 114:9-14; Exh. 20).

On September 27, 2023, Mrs. Gonzalez son, Olvin Ku, sent an email to Collins stating:

Good afternoon Shelly collins I am sending this email in response of your email you sent to Lucia Ku Gonzalez on 09/12/2023. She has been sending you text messages wondering when she can come back to work she is aware her position is given away after a certain amount of time but Lucia Ku is requesting to be return to the same position or similar a position .She has stated that her doctor has released her to return back to work and she has applied multiple times already to start working again but no one has contacted her the 3 positions she's applied for. (Gonzalez Dep. Exh. 19).

It was not until September 27, 2023 that Collins called Mrs. Gonzalez and made her aware that she had to apply for positions internally and not externally. (Gonzalez Dep. 98:10-22; 131:20-25; 132; Exh 19). Mrs. Gonzalez did not recall receiving an email from Collins on September 27, 2023 with the Guide on how to apply internally. (Gonzalez Dep. 89; Exh. 19). Collins did not create the Guide until after Mrs. Gonzales had already applied externally for positions. (Collins Dep. 34-35). Collins claimed that Mrs. Gonzalez had applied for the positions externally rather than internally and therefore her applications were rejected. (Gonzalez Dep. Exh. 19, 20; Collins Dep 34). Whether someone applies internally or externally, it is for the same position. (Griffith Dep. 23:18-25; 24:1). They do not have different positions for internal and external employees. (Griffith Dep. 23:24-25; 24:1). Ashley McLean, a recruiter for Coca Cola, explained that there is an electronic system whereby current employees can access their dashboard and apply internally for available positions. (McLean Dep. 13-14). Non-employees are required to apply externally through the website. (McLean Dep. 13-14; Collins Dep. 41-42). McLean testified that the system would typically notify an employee via email if they applied inaccurately as an external rather than internal candidate. (McLean Dep. 8:13-21; 14:15-25). However, McLean testified that she has never seen one of those emails and does not know how

10

to access it.  She saw that Mrs. Gonzalez had been contacted via text or email through the system when she applied but did not see any responses from Mrs. Gonzalez. (McLean Dep. 15-17).  McLean could not verify whether Mrs. Gonzalez had actually received an email notifying her that she had applied externally.  (McLean Dep. 44-48; 49:1-3; 52:23-25; 53:1-6).   McLean explained that when someone applies for a position internally or externally, the recruiter is notified immediately, the Paradox or AI system is engaged and communicates with the candidate, and if it is an internal candidate, Collins as the HR manager becomes involved almost immediately to determine if the candidate is eligible for consideration.  (McLean Dep. 22-23).  If Collins confirms that the candidate is eligible, the recruiter will conduct the initial interview.  (McLean Dep. 24:5-25).  If the position requires an assessment, the form will be sent to the candidate to complete within 48 hours.  (McLean Dep. 25:21-25; 26-28).  The hiring manager then reviews the assessment to determine whether the candidate is qualified for the position.  (McLean Dep. 28:18-25).  If the candidate is qualified, then the next step is an interview with the hiring manager.  (McLean Dep. 29:14-17).  If the manager wants to make an offer, the recruiter would send the offer to Collins to approve.  (McLean Dep. 30-31).

After applying for various positions, Mrs. Gonzalez was notified by Collins that she needed to apply for positions internally rather than externally.  (Gonzalez Dep. Exh. 19; McLean Dep. 44:42-44; 61; Collins Dep.40:14-25; 41-44).  After being made aware that she had to apply internally for positions, Mrs. Gonzalez submitted an application internally for a Lab Tech position on September 27, 2023.  (Gonzalez Dep.98-99; Exh. 21).  However, Mrs. Gonzalez was not contacted by the recruiter, McLean, until October 9, 2023 who told Mrs. Gonzalez that she was going to speed up the process and talk with HR in Cleveland that day so that she could get her an interview immediately and she would not lose her job. (Gonzalez Dep. 81:14-25; 82:1-11;

11

98-100; 130:5-21; Exh. 21). Collins testified that she was contacted verbally or via email by McLean about Mrs. Gonzales application and specifically about the pay. (Collins Dep. 118:9-25; 119-123). Collins does not recall what she discussed with McLean other than the pay and that she wanted to know if she could move back to her position if she did not like it. (Collins Dep. 118-123). Mrs. Gonzalez never heard back from McLean after she contacted Collins. (Gonzalez Dep. 81-82; 98-100). Collins identified an email from McLean dated October 9, 2023 regarding Mrs. Gonzalez' application for the lab tech position. (Collins Dep. 136:12-25, Exh. 28). McLean informed Collins about the pay issue and potential transfer issue. (Collins Dep. Exh. 28). McLean further reported:

> Lucia then told me that she had until 10/9 to get another position with use or she would be terminated from her position. She then asked when I would be getting a manger to interview her, and I told her that she seemed to be on a time crunch and so I would reach out to the hiring manager today. We just had our weekly call where I asked Denise Key who would be interviewing for this position, and she stated Eric so I will reach out to Eric to see when is available to interview. Please let me know if there is anything different I need to do in this particular situation. Thank you! (Collins Dep. Exh. 28).

Collins does not recall her response. (Collins Dep. 120-123). McLean did not receive a response from Collins, does not remember talking to Eric, and does not recall any further contact with Mrs. Gonzalez. (McLean Dep. 77:17-25; 78:1-22; 83:25; 84:1-25; 85-86; 97:12-23). Mrs. Gonzalez attempted to contact McLean on several occasions and left voicemails but received no response. (Gonzalez Dep. 81-82; 98-100). Mrs. Gonzalez also attempted to contact Collins and left a voicemail about the Lab Tech position. (Gonzalez Dep. 81-82; 99-100). The next day, Collins called Mrs. Gonzalez and informed her that she was separated from her employment. (Gonzalez Dep. 100-101). Mrs. Gonzalez informed Collins of her interview and Collins said "No, you're not part of the Coca-Cola no more is why I call you. If you want to work here, you have to reapply, but external, and I—you're supposed to be at your position in September

[October] 10. No apply or interview on September [October] 10. And I told her, How you want me to stay there if you don't call me. Nobody call me . How you want I do that? You don't let me. She not call me. And she said Okay. You have to apply external. I said, Okay. Thank you this is what I remember." Gonzalez Dep. 100-101). Mrs. Gonzalez testified that she did not reapply due to all of the harassment. (Gonzalez Dep. 101:16-25; 102:1). Ms. Gonzalez's son had also sent several emails to Mrs. Collins inquiring about the status of his mother's application but his emails were also ignored. (Gonzalez Dep. Exh. 19).

McLean and Collins claimed that Mrs. Gonzales was not considered for the Lab Tech position because she was sent an Assessment on October 9th to complete and it was not completed. (McLean Dep. 68; 87:1-10; Collins Dep. 44:21-25; 45:1-45). Neither McLean nor Collins could verify that Mrs. Gonzalez received the Assessment. (McLean Dep. 67-68; 115-119; Collins Dep. 123:20-25; 124:1-19). McLean testified that every employee is given 48 hours to complete the Assessment. (McLean Dep. 68; 87:1-10). Mrs. Gonzales was terminated before her 48 hour period expired on October 12th. (Gonzales Dep. 21; Collins Dep. Exh 35; McLean Dep. 89:14-20; 91:23-25). In response to Interrogatories, Collins claimed that Mrs. Gonzalez was not given the Lab Tech position because it was "canceled". (Collins Dep. 46:7-17; Gonzalez Dep. Exh. 21). However, McLean testified that the position was not canceled until after October 16, 2023 based upon the documentation which shows that Mrs. Gonzalez was not selected for an interview on October 16th. (McClean Dep. 67; Gonzalez Dep. Exh. 21). McLean claims that she was not selected for an interview because she did not complete the Assessment. (McClean Dep. 67).

On October 5, 2023, Olvin Ku again had sent an email to Collins, stating:

Good morning Shelly Collins I am sending this email because previously I sent you an email about Lucia Ku coming back to work since her doctor has released her to return

13

back to work but I haven't gotten a response. She has also applied multiple times like you told her but no one has contacted her. It would be very appreciated if you would reply back to my email thank you. (Gonzalez Dep. Exh. 19).

On October 9, 2023, Mrs. Collins mailed a letter to Mrs. Gonzalez stating that she had been out of work "since 4/6/23" and was now listed on the Company's records as "an inactive employee on leave." (Gonzalez Dep. Exh. 17). She further stated, "We hope that your condition is improving and that you will soon be able to return to work and resume performing the essential functions of your most recent position with Company subject, of course, to there being an open position." (Gonzalez Dep. Exh. 17). This letter contradicts Collins earlier statement on September 18, 2023 when she told Mrs. Gonzalez that her position was no longer available and she would have to apply for available positions on the website.

On October 11, 2023, Mrs. Collins sent an email to Mrs. Gonzalez stating:

As previously discussed, you have been out on leave for 6 months and your leave has now been exhausted. As of today, your employment with Coca-Cola United is being separated due to leave exhaustion.
You can continue to apply for positions at Coca-Cola United, but you will need to apply as an external candidate through our website at https://careers.cokeonena.corniunited.
Shortly, you will receive information from our benefits department with options for continuing your insurance coverage.
I wish you the best in all your future endeavors.
(Gonzalez Dep. Exh. 19).

Shortly thereafter, Mrs. Gonzalez was sent a Separation Notice in the mail from Collins stating that she had been terminated on October 11, 2023 for "Involuntary Separation – Leave Expired." (Collin Dep. 146-148; Exh. 35). On October 13, 2023, Collins finally responded to Ku's email dated October 5th by merely referring Ku back to her earlier email that she sent to Ku on September 28, 2023 informing him that Mrs. Gonzalez was required to apply for positions internally and not externally. (Gonzalez Dep. Exh. 19).

14

Gilley testified that Mrs. Gonzalez position was filled with a MO1 operator because MO2 is not a hiring position, you have to be promoted into that position. (Gilley Dep. 58:25; 59-63). He is not aware who filled her position. (Gilley Dep. 59:25; 60:1-5). Internal and External employees could apply for the position. (Gilley Dep. 63:11-13). When asked "is there some reason that Ms. Gonzalez could not go back to an MO2 position after she returned from her medical leave in September?", Griffith responded, "I don't remember her not being or being able to do that." (Griffith Dep. 19:9-16; 31:23-25; 32:1-3. ). He was not consulted or made aware of her termination and that is usually handled by HR. (Griffith Dep. 28:19-25; 29:1-23). Gilley testified that he did not do anything to assist Mrs. Gonzalez in finding another position. (Gilley Dep. 117:17-25; 118:1). Gilley testified that if an MO2 operator goes out on medical leave, when they return, they go back to the MO2 position if one is available. (Gilley Dep. 24:1-7). The only MO2 operator who was not returned to a MO2 position after medical leave was Mrs. Gonzalez. (Gilley Dep. 24:14-25). Mrs. Gonzalez testified that a male employee, Edwin, who was out of work for extended periods of time was returned to his same position. (Gonzalez Dep. 155-156).

## I.    TENNESSEE DISABILITY ACT

After Mrs. Gonzalez exhausted her FMLA, she was approved for short-term disability for 3 months. Defendant claims that since Mrs. Gonzalez was not disabled, she cannot assert a claim under the Tennessee Disability Act. However, in **Cannon v. Univ. of Tenn.,** No. 3:15-CV-576 (E.D. Tenn. May 17, 2017), the Court held:

> A plaintiff need not actually be disabled to assert a claim of disability retaliation. However, the plaintiff must have a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA. Barrett v. Lucent Tech., 36 F. App'x 835, 840 (6th Cir. 2002).
> To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate: (1) he engaged in protected activity; (2) his engagement in that protected activity was known to his employer; (3) his employer, thereafter, took an adverse employment action against

15

him; and (4) a causal link exists between his engagement in the protected activity and the adverse employment action. Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014); Spence, 515 F. App'x at 572 (applying same factors under the Rehabilitation Act). The only prima facie element challenged here, the causal connection, requires a plaintiff to produce sufficient evidence to infer that an employer would not have taken the adverse employment action had the plaintiff not engaged in a protected activity. Barrett, 36 F. App'x at 841. "A causal connection may be shown by direct evidence or by knowledge of the complaints on the part of the employer coupled with a closeness in time sufficient to create an inference of causation." Id. "[W]here an employer treats an employee differently after she asserts her rights under the ADA than before she had done so, a retaliatory motive may be inferred. See Cantrell v. Nissan N. Am. Inc., 145 F. App'x 99, 105-06 (6th Cir. 2005); Walborn v. Erie County Care Facility, 150 F.3d 584, 589 (6th Cir. 1998).

The same factors should be applied under the Tennessee Disability Act. "A TDA claim is analyzed under the same principles as those used for the ADA. **Nance v. Goodyear Tire & Rubber Co**., 527 F.3d 539, 553 n.5 (6th Cir. 2008)." **Sherbyn v. Tyson Fresh Meats, Inc**., No. 3:13-0092 (M.D. Tenn. Mar 30, 2015).  In this case, Mrs. Gonzalez engaged in protected activity by taking additional leave through short term disability after her FMLA was exhausted which was offered by Defendant, who then terminated her employment when she was released to return to work.  There was clearly a causal link as the short-term disability ended on September 25, 2023 and she was terminated on October 11, 2023.  In addition, Mrs. Gonzalez was treated differently after she took FMLA and short term disability and all of her efforts to return to work were thwarted by Defendant.  The only reason given for her termination was "leave exhaustion".  Mrs. Gonzalez followed all instructions by her employer in an attempt to secure another position after her position was allegedly backfilled at some unknown point in time.  Contrary to Collins testimony, Griffith, Gilley, and Fitch were all in agreement that they always have MO1 positions available.  As stated above, Gilley testified that if an MO2 operator goes out on medical leave, when they return, they go back to the MO2 position if one is available and the only MO2 operator who was not returned to a MO2 position after medical leave was Mrs. Gonzalez.  In

16

fact, another male MO2, Edwin, who was out of work for extended periods of time was returned to his same position.

## II.    <u>**FMLA RETALIATION**</u>

Defendant retaliated against Mrs. Gonzalez for taking FMLA leave and short-term disability. In **Cannon v. Univ. of Tenn.,** No. 3:15-CV-576, (E.D. Tenn. May 17, 2017), the court identified the elements of a retaliation claim, stating:

> Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Seeger*, 681 F.3d at 283. To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) this exercise of his protected rights was known to the defendant, (3) he suffered an adverse employment action, and (4) there was a causal connection between the adverse employment action and the protected activity. *Tennial v. United Parcel Serv., Inc.*, No. 15-6356, 2016 WL 6156315, at *9 (6th Cir. Oct. 24, 2016). If the plaintiff satisfies his prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Seeger*, 681 F.3d at 284. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. *Id*. at 285. "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (alteration in original).
> Although neither party specifies this, it appears that the only prima facie element in dispute is whether plaintiff can establish a causal connection. In order to establish a causal connection, a plaintiff must show some type of retaliatory intent. *Tennial*, 2016 WL 6156315, at *9. An FMLA retaliation claim accordingly centers around "[t]he employer's motive ... because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (emphasis in original).

Mrs. Gonzalez provided proper notice of her return to work and made every effort to secure another position with the company. However, Collins made it impossible for Mrs. Gonzalez to secure another position and then terminated her employment for not securing a position. Mrs. Gonazalez attempted to comply with every request made by Mrs. Collins to find another position.

The deposition testimony of Collins and McLean clearly shows that Collins did not intend for Mrs. Gonzalez to return to work after her FMLA and short term disability ended and she did everything she could to undermine the efforts of Mrs. Gonzalez to secure another position. Collins refused to acknowledge Mrs. Gonazlez' return to work notice from her doctor for September 25, 2023 although it was repeatedly provided to Collins. She claimed that her MO2 position was backfilled with a new MO1 when everyone agreed that they needed more employees who were trained as MO2s. She did not schedule Mrs. Gonzalez for a drug test which was routine, and she provided confusing, inconsistent, and impossible deadlines and instructions to Plaintiff. She did not return the calls and texts from Mrs. Gonzalez and her son. She did not inform Mrs. Gonzalez that her applications would be rejected if she applied externally rather than internally and even when she was aware of her applications externally, she rejected them. Mrs. Gonzalez testified that she was not aware of any requirement that she apply internally versus externally for available positions. Collins provided no authority for rejecting her applications merely because they were submitted externally. However, when Collins made her aware of the policy she complied. All efforts by Mrs. Gonzalez to secure another position were thwarted by Mrs. Collins. When Mrs. Gonzalez applied internally for the Lab Tech position and was assured of an interview by McLean before her termination, Collins intervened to stop her application and then terminated Mrs. Gonzalez and told her she would have to apply externally. The actions of Collins were retaliatory and intended to ensure that Mrs. Gonzalez did not obtain another position. When Mrs. Gonzalez previously attempted to return to work in March 2023, Collins sent her for a drug test and then reprimanded her when she was late to work due to the drug test. This caused Mrs. Gonzalez so much distress that she had to go back on

18

medical leave.  The mistreatment continued when Mrs. Gonzalez attempted to return on September 25, 2023 when her short-term disability ended.

Defendant claims that Mrs. Gonzalez was terminated due to her inability to return to work after exhausting her leave.  However, the testimony of Collins shows that the inability of Ms. Gonzalez to return to work was caused solely by the actions of Collins, who intentionally sabotaged every effort by Mrs. Gonzalez to secure another position.

With regard to a causal link, the Sixth Circuit held in **Seeger v. Cincinnati Bell Tel. Co.**, 681 F.3d 274, 283,18 Wage &amp; Hour Cas.2d (BNA) 1831, 45 NDLR P 29 (6th Cir. 2012:

> "[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir.2004); see also Clark v. Walgreen Co., 424 Fed.Appx. 467, 473 (6th Cir.2011) (per curiam) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir.2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation."); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir.2007) (holding that the three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here, Seeger has shown causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation.

In this case, temporal proximity gives rise to an inference of retaliation since her FMLA was exhausted on July 15, 2023, her short-term disability ended on September 25, 2023, and she was terminated on October 11, 2023.  This was all within less than a 3 month period.

With regard to retaliatory intent, although Mrs. Gonzalez had repeatedly notified Mrs. Collins of her ability and intent to return to work on September 25, 2023, Mrs. Collins refused to

19

allow Mrs. Gonzalez to return to work, intentionally ignored her doctor's return to work notices, did not schedule her for a return to work drug test, provided her with confusing and inaccurate information regarding her leave, and willfully interfered with and undermined her efforts to secure another position. The actions of Collins clearly show retaliatory intent.

Defendant has failed to identify a legitimate reason for the termination of Mrs. Gonzalez' employment.  Defendant claims that it had a legitimate, non-discriminatory reason to terminate Mrs. Gonzalez's employment because she refused to return to work.  However, Mrs. Gonzalez provide adequate notice of her return to work, repeatedly applied for available positions, had interviews scheduled, and then Defendant repeatedly refused to facilitate her return to work and used the fact that she had applied externally versus internally as a reason to cancel or deny her applications.  This is not a legitimate reason for her termination.  Emails between Mrs. Gonzalez and Collins clearly show that Collins knew Mrs. Gonzalez was being released by her doctor to return to work on September 25, 2023 but she refused to acknowledge her return to work. Although Mrs. Gonzalez had repeatedly notified Mrs. Collins of her ability and intent to return to work on September 25, 2023, Mrs. Collins intentionally ignored her return to work notice, did not schedule her for a return drug test, provided her with confusing and inaccurate information regarding her position and the need to secure another position, and willfully interfered with and undermined her efforts to secure another position.

### III.  THRA

### A.  HOSTILE WORK ENVIRONMENT

After Mrs. Gonzalez repeatedly requested to be trained for a MO2 position, she testified that her supervisors became hostile and began harassing her as outlined above.  As a result, she became anxious and emotionally distraught, resulting in her need for medical and psychological

20

treatment which required leave under the FMLA. Ms. Gonzalez repeatedly complained to the plant manager, the shift manager, and her supervisors that she was being denied the training due to her gender. She also identified several male employees who had been provided the training and promoted to a MO2 position over her. Her complaints were frequent and well documented in the record. There was not a serious investigation of her complaints, as the plant manager, Griffith, testified that he did not determine the reason for the lack of training but met with Mrs. Gonzalez and Collins in an effort to get her training started, which was a year after she had been certified as a MO2. The shift manager, Gilley, also testified that he met with Mrs. Gonzalez in an attempt to get the training started. No one could provide a clear answer for the failure to provide training to Mrs. Gonzalez when everyone agreed that the company strongly encourages the supervisors to train employees for MO2 positions and there is no limit on the number of positions.

In **Canon, supra,** the Court held:

> A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Moreover, the purported harassment must be "because of the employee's protected status." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007); ...

In **Frye v. St. Thomas Health Services,** 227 S.W.3d 595 (Tenn. App. 2007), 609, the Court further held:

> To establish a hostile work environment claim, a plaintiff must show that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic of the employee, such as age; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under either a theory of vicarious or direct liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir.2002). A hostile work environment claim is established upon proof of conduct that is "sufficiently severe or pervasive `to alter the conditions of [the victim's]

employment and create an abusive working environment.'" Meritor Sav. Bank, FSB, 477 U.S. at 67, 106 S.Ct. 2399 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982)).

Mrs. Gonzelez experienced severe and pervasive harassment based upon her gender from her supervisors in the form of being denied the training that was required for her to be promoted to a MO2, being constantly singled out and yelled at for talking or being on her cell phone when others were not, receiving no assistance on her machine so she could go the bathroom, being denied vacation time and monetary incentives, and being surrounded and intimidated by her supervisors. This conduct by her supervisors created an abusive working environment for Mrs. Gonzalez.

## B. RETALIATION

Mrs. Gonzalez also suffered retaliation as a result of her complaints of gender discrimination. In **Goree v. United Parcel Serv., Inc**., 490 S.W.3d 413 (Tenn. App. 2015), 443, the Court held:

> A claimant must prove the following four elements to prevail on a retaliation claim under the THRA:(1) that [the plaintiff] engaged in activity protected by the THRA;(2) that the exercise of [the plaintiff's] protected rights was known to the defendant;(3) that the defendant thereafter took a materially adverse action against [the plaintiff]; and(4) there was a causal connection between the protected activity and the materially adverse action.Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 29 (Tenn.2011) (quoting Allen v. McPhee, 240 S.W.3d 803, 820 (Tenn.2007) abrogated on other grounds by Gossett v. Tractor Supply Co., 320 S.W.3d 777, 783–84 (Tenn.2010) ).

Defendant claims that Mrs. McPherson cannot establish causal connection between her termination and her protected activity and that temporal proximity alone is insufficient. However, the Sixth Circuit held otherwise in **Seeger v. Cincinnati Bell Tel. Co**., 681 F.3d 274, 283,18 Wage &amp; Hour Cas.2d (BNA) 1831, 45 NDLR P 29 (6th Cir. 2012), stating:

> "[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is

22

acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir.2004); see also Clark v. Walgreen Co., 424 Fed.Appx. 467, 473 (6th Cir.2011) (per curiam) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir.2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of establishing a prima facie case of retaliation."); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir.2007) (holding that the three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here, Seeger has shown causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation.

Mrs. Gonzalez complained to the Plant Manager, Griffith, in January 2023 about the failure to train for the MO2 due to her gender. She continued to complain until she was finally promoted to MO2 in March, 2023. She was terminated on October 11, 2023.

## CONCLUSION

Based upon the foregoing facts and authorities, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied with costs taxed to the Defendant.

Respectfully submitted,

**GRACE E. DANIELL, P.C.**

By: *  /s/ Grace E. Daniell          *
Grace E. Daniell, BPR #012045
Attorney for Plaintiff
P.O. Box 4307
Chattanooga, TN 37405
(423) 266-3179
gedaniell@gracedaniell.com

23

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished to the following party via electronic mail:

John W. Hargrove
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
jhargrove@bradley.com

Katherine E. Griffin
BRADLEY ARANT BOULT CUMMINGS LLP
ONE 22 ONE
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
kgriffin@bradley.com

This 20th day of March, 2026.

/s/ Grace E. Daniell
Grace E. Daniell

24